# EXHIBIT A



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

September 13, 2005

Paul V. Kelly, Esq.
Kelly, Libby & Hoopes
175 Federal Street
Boston, MA 02110

       Re:  Joseph DiFlumera
            Criminal No. 04-40002

Dear Mr. Kelly:

    This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Joseph DiFlumera ("Defendant"), in the above-captioned case.  The Agreement is as follows:

       1.  <u>Change of Plea</u>

— SECOND SUPERSEDING

    At the earliest practicable date, Defendant shall plead guilty to Counts 2 through 7 of the above-captioned Indictment: Crim. No. 04-40002.  Defendant expressly and unequivocally admits that he in fact knowingly committed the crimes charged in Counts 2 through 7 of the Indictment, and is in fact guilty of those offenses.

    The government also agrees to dismiss counts 1 and 8 through 11 of the Indictment at the time of sentence.

       2.  <u>Penalties</u>

Defendant faces the following maximum penalties on each count:

a.  20 years' incarceration in the custody of the Attorney General;

b.  a fine of $250,000;

c.   five years' supervised release; and

d.   a special assessment of $100,00.

3.   <u>Sentencing Guidelines</u>

The parties agree to jointly take the following positions at sentencing:

(a)   The base offense level is 6 pursuant to U.S.S.G. §2B1.1.

(b)   The specific offense characteristic §2B1.1(b)(1)(I) applies and results in an increase of 16 levels.

(c)   The specific offense characteristic §3B1.3 applies and results in an increase of 2 levels.

The U.S. Attorney's agreement that the disposition set forth below is appropriate in this case is based, in part, on Defendant's prompt acceptance of personal responsibility for the offense(s) of conviction in this case.

The U.S. Attorney specifically may, at his sole option, be released from his commitments under this Agreement, including, but not limited to, his agreement that paragraph 4 constitutes the appropriate disposition of this case, if at any time between his execution of this Agreement and sentencing, Defendant:

(a)   Fails to admit a complete factual basis for the plea;

(b)   Fails to truthfully admit his conduct in the offenses of conviction;

(c)   Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

(d)   Fails to provide truthful information about his financial status;

(e)   Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

(f)   Engages in acts which form a basis for finding that Defendant has obstructed or impeded the

2

administration of justice under U.S.S.G. § 3C1.1;

(g)  Intentionally fails to appear in Court or violates any condition of release;

(h)  Commits a crime; and/or

(i)  Transfers any asset protected under any provision of this Agreement.

Defendant expressly understands that he may not withdraw his plea of guilty, unless the Court rejects this Agreement under Fed. R. Crim. P. 11(c)(5).

4.  Agreed Disposition

The U.S. Attorney and Defendant agree pursuant to Fed. R. Crim. P. 11(c)(1)(C) that the following is the appropriate disposition of this case:

(a)  a term of imprisonment of 46 months;

(b)  a fine that is within the guideline range as determined by the court at the time of sentence unless there is a finding that the defendant lacks sufficient funds to pay a fine ;

(c)  a mandatory special assessment of $600; and

(d)  a term of supervised release of not more than two years.

The U.S. Attorney and Defendant agree that there is no basis for a departure from the sentencing range established by the United States Sentencing Guidelines, except as explicitly described in paragraph 3, above.  Accordingly, neither the U.S. Attorney nor Defendant will seek a departure on any ground from the Sentencing Guidelines.

5.  Payment of Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing, unless Defendant establishes to the satisfaction of the Court that Defendant is financially unable to do so.

6.  Waiver of Rights to Appeal and to Bring Collateral Challenge

3

Defendant is aware that he has the right to challenge his sentence and guilty plea on direct appeal. Defendant is also aware that he may, in some circumstances, be able to argue that his plea should be set aside, or his sentence set aside or reduced, in a collateral challenge such as pursuant to a motion under 28 U.S.C. § 2255.

In consideration of the concessions made by the U.S. Attorney in this Agreement, Defendant knowingly and voluntarily waives his right to appeal or collaterally challenge:

(1)  Defendant's guilty plea and any other aspect of Defendant's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

(2)  The imposition by the District Court of the sentence agreed to by the parties, as set out in paragraph 4 and, even if the Court rejects one or more positions advocated by the parties with regard to the application of the U.S. Sentencing Guidelines.

In consideration of the concessions made by the U.S. Attorney in this Agreement, Defendant agrees not to seek to be sentenced or resentenced with the benefit of any successful collateral challenge of any counseled criminal conviction that exists as of the date of this Agreement.

Defendant's waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges based on new legal principles in First Circuit or Supreme Court cases decided after the date of this Agreement which are held by the First Circuit or Supreme Court to have retroactive effect.

This Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the U.S. Attorney therefore retains his appeal rights.

7.  <u>Waiver of Hyde Amendment Claim</u>

Defendant is aware that 111 Stat. 2440, 2520 (1997), the so-called "Hyde Amendment," authorizes courts in criminal cases to award to certain prevailing defendants attorneys' fees and other litigation expenses. In exchange for concessions made by the U.S. Attorney in this Agreement, Defendant voluntarily and knowingly

4

waives any claim that he might assert under this statute based in whole or in part on the U.S. Attorney's agreement in paragraph 1 to dismiss counts one and eight through eleven.

### 8.   Probation Department Not Bound By Agreement

The sentencing disposition agreed upon by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the United States Probation Office. Defendant's C plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Defendant cannot withdraw his plea of guilty unless the sentencing judge rejects this Agreement. If the sentencing judge rejects this Agreement, this Agreement shall be null and void at the option of either the United States or Defendant. In this regard, Defendant hereby waives any defense to any charges which he might otherwise have under any statute of limitations or the Speedy Trial Act.

### 9.   Information For Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning his assets.

### 10.   Civil Liability

By entering into this Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, which Defendant may have incurred or may incur as a result of his conduct and his plea of guilty to the charges specified in paragraph one of this Agreement.

### 11.   Withdrawal of Plea By Defendant

Should Defendant move to withdraw his guilty plea at any time, this Agreement shall be null and void at the option of the U.S. Attorney.

### 12.   Breach of Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any provision of this Agreement, has violated any condition of his pretrial release, or has committed any crime following his execution of this Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this Agreement. Further, the U.S. Attorney may pursue any and all charges which

have been, or are to be, dismissed pursuant to this Agreement. Defendant recognizes that no such breach by him of an obligation under this Agreement shall give rise to grounds for withdrawal of his guilty plea. Defendant understands that, should he breach any provision of this agreement, the U.S. Attorney will have the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by him, and any information, materials, documents or objects which may be provided by him to the government subsequent to this Agreement, or pursuant to any proffer agreement without any limitation. In this regard, Defendant hereby waives any defense to any charges which he might otherwise have under any statute of limitations or the Speedy Trial Act.

### 13. Who Is Bound By Agreement

This Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

### 14. Complete Agreement

This letter contains the complete and only agreement between the parties relating to the disposition of this case. No promises, representations or agreements have been made other than those set forth in this letter and in the proffer letter dated September 9, 2003. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral with the sole exception of those contained in the proffer letter dated September 9, 2003. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the Agreement between the
U.S. Attorney and Defendant, please have Defendant sign the
Acknowledgment of Agreement below.  Please also sign below as
Witness.  Return the original of this letter to Assistant U.S.
Attorney Laura J. Kaplan.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By _____  FAUSA

LAURA J. KAPLAN, Chief
Violent & Organized Crime
Section 9/13/5

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and discussed it
with my attorney.  I hereby acknowledge that it fully sets forth
my agreement with the United States Attorney's Office for the
District of Massachusetts.  I further state that no additional
promises or representations have been made to me by any official
of the United States in connection with this matter. I understand
the crimes to which I have agreed to plead guilty, the maximum
penalties for those offenses and Sentencing Guideline penalties
potentially applicable to them.  I am satisfied with the legal
representation provided to me by my attorney.  We have had
sufficient time to meet and discuss my case.  We have discussed
the charges against me, possible defenses I might have, the terms
of this Plea Agreement and whether I should go to trial.  I am
entering into this Agreement freely, voluntarily, and knowingly
because I am guilty of the offenses to which I am pleading guilty
and I believe this Agreement is in my best interest.

_____

Joseph DiFlumera
Defendant

Date:_____

7

I certify that Joseph DiFlumera has read this Agreement and that we have discussed its meaning. I believe he understands the Agreement and is entering into the Agreement freely, voluntarily and knowingly.


_____
Paul V. Kelly, Esq.
Attorney for Defendant

Date:_____

**EXHIBIT B**

Attn: Mr. Paul Kelly
      and
      U.S.Court Judge Nathaniel Gorton

March 27, 2004

I have known Mr. DiFlumera since my arrival in Ormond Beach in January 1990 where we were neighbors. I am a retiree of the Central Intelligence Agency and believe that I am a fairly good judge of people. Mr. DiFlumera impresses me with his deep pride in family. He is also deeply religious and extremely generous with family and friends. As an example, when he returns to Massachusetts he regularly visits nursing homes where relatives are living and one special friend, Captain Jack Ferris who is a retired police officer from Worcester.

I am not familiar with Joe's business activities or his business associates. Having spent nearly thirty years with the federal government, I am not aware of how private businesses operate. I can only say that from a personal objective everybody should have a friend like Joe.

In conclusion I have found him to be honest and hard working.

Sincerely,

Robert C. Stello

Honorable Nathaniel M. Gorton
John Joseph Moakley
US Courthouse, Suite 5120
1 Courthouse Way
Boston, MA 02210

May 18, 2004

Dear Judge Gorton,

For well over thirty years, I have been blessed to have Mr. Joseph

DiFlumera as one of my true friends. He is a real special person,

very religious, hard working, honest, proud, generous and a good

family man.

I am a retired Police Captain of thirty years from Worcester, MA. I

am well aware of Joe's case in New Orleans as I counseled him on

his plea agreement. He was a victim of circumstance.

Over the past ten years I have been in three different assisted living

facilities. I have four children who I don't see but four or five

times a year. Joe visits me on average of three to four times a

month. He takes me out to eat, shops for food, and makes sure I

have all I need. He cares for me better than my family. He assures

me of financial independence.

I don't believe the allegations made by the CEO of Victory Markets and I can assure you that Joe would not hurt a fly. Over the years Joe has confided in me on the problems and situations at Victory Markets, the CEO taking unauthorized money from the Real Estate Trust, as well as, having work done at his home and charging the company. I am also aware that the Uncle, Joe, one of the owners, filed charges against the CEO, his brothers and father. There is a lot more than meets the eye.

Your Honor, Joe is seventy years old, has a daughter with Down's Syndrome, lost one daughter a year ago to cancer, has another who is in remission and most importantly, he is not in good health. He is a good man and deserves your kind consideration. Thank you!

Sincerely and Respectfully Yours,
Captain Jack Ferris, Retired

# THE INVESTIGATIVE GROUP, INC.

3939 Veterans Boulevard, Suite 215
Metairie, LA 70002



Tommy Patterson, CFE
Ann Cangelosi, CFE

Tel.: 504-455-1955
Fax: 504-455-1959

*Licensed Private Investigators*

May 19, 2004

Honorable Nathaniel M. Gorton
U. S. Courthouse Suite 5120
1 Courthouse Way
Boston, MA 02210

Dear Judge Gorton:

I am writing this letter on behalf of Mr. Joseph DiFlumera.

I was employed as an Internal Revenue Service Special Agent with the Criminal
Investigation Division in New Orleans, Louisiana from 1971 until I retired in 1996. In
1987, I was one of the case agents investigating a nationwide money laundering case. The
original cases in New Orleans spread to Boston, Massachusetts and Las Vegas, Nevada.
One of the subjects of the investigation was Joseph DiFlumera. The cases resulted in
arrests in January 1988 and shortly thereafter, Joseph DiFlumera, through his attorney,
Henry Rigali from Springfield, Massachusetts began cooperating with the government.
DiFlumera pled guilty and provided assistance relating to numerous subjects including
Howard McNaughton, Anthony Silano and Mark Henrich. Silano and Henrich pled guilty
and McNaughton was found guilty at trial. After the trial, DiFlumera continued to
provide information and participated in at least two consensual recordings with
individuals. These recordings did not result in prosecutions.

I introduced DiFlumera to several Special Agents with the Internal Revenue Service and
the Federal Bureau of Investigation. It is my understanding that DiFlumera was helpful to
these agents.

During the period that DiFlumera was cooperating with the government, he suffered from
asthma attacks and was hospitalized on occasion.

I am aware that Joe DiFlumera is a family man and each year at Christmas, I receive a
Christmas card with information about the well being of he and his family. I know that
for many years he was the primary caretaker of his mother who has since passed away
and he lost a daughter to cancer recently.

I am sorry to hear about Mr. DiFlumera's current legal problems and hope that this letter will be of assistance to you in your deliberations.

Sincerely,

Tommy Patterson

# THE INVESTIGATIVE GROUP, INC.

3939 Veterans Boulevard, Suite 215
Metairie, LA 70002



Tommy Patterson, CFE
Ann Cangelosi, CFE

Tel.: 504-455-1955
Fax: 504-455-1959

*Licensed Private Investigators*

May 19, 2004

Honorable Nathaniel M. Gorton
U. S. Courthouse Suite 5120
1 Courthouse Way
Boston, MA 02210

Dear Judge Gorton:

I am writing this letter on behalf of Mr. Joseph DiFlumera.

I was employed as an Internal Revenue Service Special Agent with the Criminal
Investigation Division in New Orleans, Louisiana from 1981 until 1996. In 1987, I was
one of the case agents investigating a nationwide money laundering case. The original
cases in New Orleans spread to Boston, Massachusetts and Las Vegas, Nevada. One of
the subjects of the investigation was Joseph DiFlumera. The cases resulted in arrests in
January 1988 and shortly thereafter, Joseph DiFlumera, through his attorney, Henry
Rigali from Springfield, Massachusetts began cooperating with the government.
DiFlumera pled guilty and provided assistance relating to numerous subjects including
Howard McNaughton, Anthony Silano and Mark Henrich. Silano and Henrich pled guilty
and McNaughton was found guilty at trial. After the trial, DiFlumera continued to
provide information and participated in at least two consensual recordings with
individuals. These recordings did not result in prosecutions.

In approximately 1996, DiFlumera contacted me with information relating to the location
of a reputed Mafia hitman in the Bahamas. I forwarded this information to Special Agent
Charles McGinty, an associate of mine in the New Orleans office of the Federal Bureau
of Investigation. Special Agent McGinty later advised me that the information provided
by DiFlumera was crucial in the apprehension of the individual.

During the period that DiFlumera was cooperating with the government, he suffered from
asthma attacks and was hospitalized on occasion.

I am aware that Joe DiFlumera is a family man and each year at Christmas, I receive a Christmas card with information about the well being of he and his family. I know that for many years he was the primary caretaker of his mother who has since passed away and he lost a daughter to cancer recently. DiFlumera has told me that he has a young grandson from his deceased daughter who is being cared for by one of his other daughters. This daughter is currently in remission from cancer.

I hope that this information will be of assistance in your determination of Mr. DiFlumera's future.

Sincerely,

Ann Cangelosi

Ann Cangelosi

2

Letellier
150 Maple Street
Agawam, MA 01001

June 7, 2004

Honorable Nathaniel M. Gorton
United States Federal Court
1 Courthouse Way, Suite 5120
Boston, MA 02210

RE:   Joseph DiFlumera

Dear Honorable Judge Gorton:

I am writing this letter on behalf of Joseph DiFlumera whom I have known for over thirty years as a gentleman and a friend.

I am a retired police officer from Agawam, Massachusetts with thirty-five years on the job in a variety of positions.  In my work as a police officer I have investigated all types of crimes, spoken to youth groups, and even developed a program in which residents of the county jail would speak with teenagers on how drugs and alcohol damaged their lives.  Such straight talk really impressed the kids.

During the years, many of the people I have had to deal with have become friends.  I have developed a trust among those I have helped over the years, especially teenagers, such that even today I still receive Thank Yous from the same youths and their parents.

Joseph DiFlumera has always been a gentleman throughout the years.  At Christmas and Thanksgiving he would deliver baskets to local needy families without receiving any recognition or would purchase them and ask others, including myself, to deliver them anonymously.

When local charities or civic organizations would have fund raisers, Joe was their with supplies and assistance. I know this first hand. Joe and I were members of the Agawam Chapter of UNICO, an Italian civic and charitable organization. I was elected to be both local chapter President and a District Governor.  Joe was always ready, willing and able to assist.

Joe has also been very active in union organizing. I first met Joe when my police department was attempting to unionize.  This was not a welcome thing.  Although not a police officer he successfully assisted my department in getting an independent union. This was a hard fought battle and Joe went out of his way to help our then 30 officers. He has also been very active in the National Food and Commercial Workers Union, a job which unfortunately took him away from his family for many days at a time but which helped many people.

Letellier
150 Maple Street
Agawam, MA 01001

Honorable Nathaniel M. Gorton
June 7, 2004
Page 2 of 2

Joe is a deeply religious man. When he is in Agawam he attends St. Anthony of Padua Church, where I am an active member. Again, he is generous to the church. He is a very strong family man and his grandchildren adore him and he loves to spoil them.

Everyone has a life of ups and downs. Joe has recently suffered the loss of a daughter who struggled with special needs her entire life. Joe and she were very close. Now Joe is 70 years old and has health problems of his own. I am asking for any considerations you could give to Joe in his current situation, acknowledging the good he has done for so many over the years.

Thank you for taking the time to read this.

Sincerely,

*Terry*

Walter T. "Terry" Letellier

Richard J. Preis
1103 Landers Street
Ormond Beach, FL. 32174

May 27, 2004

Judge Nathaniel Gorton
C/O Kelly, Libby and Hooper
175 Federal Street 8th floor
Boston, MA. 02110

Re: Joseph Diflumera

Dear Judge Gorton,

This letter is in regards to Joseph Diflumera, who I have personally known for approximately the past eight years. I have been a police officer for the past eighteen years and I also own a lawn and landscaping business in Ormond Beach, Florida, and Joseph has been a loyal customer of mine. He has always paid his account ahead of time. I have found him to be an honest customer and consider him a good friend.

Sincerely,

Richard J. Preis

JUDGE SIDNEY M. COOLEY
1380 Main Street
Springfield, MA 01103

May 24, 2004

KELLY, LIBBY & HOOPES, P.C.
175 Federal Street
Boston, MA 02110
Attn: Paul Kelly, Esq.

**RE:   JOSEPH DIFLUMERA**

Dear Attorney Kelly:

I have been asked to write a character reference letter on behalf of Joseph Diflumera.  I am pleased to do so.

I have known Joe for a period in excess of twenty-five (25) years and consider him a friend.

I first met Joe Diflumera some twenty-five (25) or thirty (30) years ago when he was involved in labor negotiations with my brother, Attorney Edward B. Cooley, a specialist in labor relations.

All of my experiences with Mr. Diflumera have been positive.  I know him as a caring individual who has always been helpful and extremely responsive to requests for assistance for worthwhile causes.

I am also aware of his deep involvement with Special Olympics and his devotion and dedication to his family and particularly his developmentally disabled child.

I believe that Joseph Diflumera is a very good person who is worthy of consideration in this present difficulties.

Very truly yours,

SIDNEY M. COOLEY

SMC/kk

{Document=X:\DOCS\999\999\lettmemo\00062399.DOC;1}



**Prince of Peace Catholic Church**
600 South Nova Road
Ormond Beach, Florida 32174

TELEPHONE 386-672-5272
FAX 386-677-3224

June 11, 2004

Hon. Nathaniel M. Gorton
John Joseph Moakley U.S, Courthouse
Suite 5120
1 Courthouse Way
Boston, MA   02210

Dear Judge Norton,

Joe Di Flumera is known to me personally and is a faithful, attending, participating member of our Church since January 5, 1987. I have known him since 1995, when I became Pastor of this Church of Prince of Peace.

He is a dedicated family man, taking care of his Mom and Dad till they passed on and has two living daughters, Lisa, 36 in Massachusetts, and Laura, 37, who has Down Syndrome, and an older daughter, Barbara who was 41 when she passed away with cancer in 2001.

Joe is a sincere, honest man whom I count it a privilege and blessing to know and have as a member of our congregation.

Sincerely yours,

Thomas P. McMackin, Pastor

# GERMANNA RICHARD

Westbrook Heights Rest Home
PO Box 580, Rte. 9 - Brookfield Road
West Brookfield, MA 01585

May 11, 2004

Honorable Nathaniel M. Gorton
US Courthouse, Suite 5120
1 Courthouse Way
Boston, MA 02210

Dear Judge Gorton,

I am writing this letter in support of Mr. Joseph DiFlumera, who is in fact, the only
guardian for Ms. Jean Castagnaro. Jean has spent from April 14, 1983 to July 2, 1999 at
The Catherine Rest Home in Worcester, MA, at which time, Mr. DiFlumera transferred
Jean to the Westbrook Heights Rest Home, which is where she has resided for the past
five years.

All of these years, Mr. DiFlumera has cared for her in the highest regard and made sure
she has had the necessary items to have her live comfortably, such as: new clothing when
needed, excellent medical care when needed, spending money, as well as, supplying her
with "goodies", which are the cigarettes and snacks she so looks forward to him sending
and bringing on a bi-monthly basis.

I can state factually that I have witnessed on many occasions Mr. DiFlumera being a truly
good person, not only caring for Jean, but at times throughout the year, to the 29 clients
that reside in this facility. Without Mr. DiFlumera, Jean would have no one!

I humbly ask that whatever you can do to continue the security and well being of
Ms. Jean Castagnaro, through the efforts of Mr. DiFlumera, will be most appreciated by
Jean, the clients and myself.

Thanking you in advance for your kindness, I remain

Sincerely yours,

Ms. Germanna Richard, Owner
Westbrook Heights Rest Home

# UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 1459



**33 EASTLAND STREET • SPRINGFIELD, MASS. 01109**

SCOTT L. MACEY, *President*
DAN CLIFFORD, *Sec-Treas.*

May 1, 2004

Mr. Paul Kelly, Esquire
175 Federal Street
Boston, MA  02110

## RECOMMENDATION:  JOSEPH J. DIFLUMERA

Dear Attorney Kelly:

Mr. Joseph DiFlumera has distinguished himself as a true leader through his hard work ethics and his very special character.  His resume and record of involvement in the Labor Movement all attest to the considerable breath and depth of his personality and character.

Joe started his career at Stop & Shop as a part-timer and worked his way up to Grocery Manager.  After ten (10) years with the Company, Joe became President and Chief Executive Officer of United Food and Commercial Workers Union (UFCW) Local 1459 from 1959 through 1976.  I had the pleasure of working for Joe for a number of years as a Union Representative.  His proven leadership skills and strength of character allowed him to effectively run Local 1459 and prepared him to further his career as Executive Assistant Organizing Director to former UFCW International President Douglas Dority.  Most recently, Joe started the Northeast Labor Consultant Group.  His energy and perseverance have allowed Joe to have founded such a distinguished organization.

Yes, Joe DiFlumera has it all!  Honestly, strong work ethics, generosity and leadership skills, on top of all his work experience, Joe has maintained the healthy balance of work and strong family life.

I am convinced that Joe will continue to prove his hard work ethic and leadership skills in this position.  Joseph J. DiFlumera is a man that deserves any and all considerations.  I am pleased and proud to give him my highest and most sincere recommendation!

Very truly yours,

Scott L. Macey
President

SLM:fah

415 North Halifax Drive
Ormond Beach, Florida  32176
December 8, 2005

re:  Docket# 04-40002

The Honorable Nathaniel M. Gorton
John Joseph Moakley U.S. Courthouse, Suite 5120
Boston, Massachusetts  02210

Your Honor:

I am writing in behalf of Mr. Joseph J. Di Flumera,
who soon will be appearing before you in court.

I have known Mr. Di Flumera for three years through
our parish, Our Lady of Lourdes, where he attends Holy Mass
daily.  During that time I have known him not only as a
devout member of the parish, but also I have observed him
in his constant kindnesses to those less fortunate than he.
Especially have I noticed his goodness to those who are
disabled.  He provides transportation for those who, other-
wise would have difficulty in attending Church for the dis-
tance and/or personal inability.  He sees to the needs of
those around him, and he is particularly concerned with
the well-being of all.

I know virtually nothing of the particulars for which
Joseph will appear in court; however, I feel, in conscience,
that I must ask your indulgence for the time that it takes to
read my remarks.  Given his health problems and age, I am
praying that, if convicted, he may provide restitution to
society in community service rather than in incarceration.

I realize that you do not know me personally and may
wonder at my responsibility and sincerity; however, I was
your Lieutenant-Governor's language arts teacher at Seabreeze
High School in Daytona Beach, Florida, and I am certain that
she would vouch for my character.  My telephone number is
(386)  677-0188.

Thank you for your kindness in reading my letter.

Respectfully in Our Lord,


Rev. Richard E. Grasso

**EXHIBIT C**

LANCE M. DODES, M.D.
SUITE 340D
53 LANGLEY ROAD
NEWTON CENTRE, MASSACHUSETTS 02459

May 23, 2004

### Report on Joseph DiFlumera

### Introductory Information

Mr. DiFlumera is a 69 year old married man who has entered into an agreement with the United States Attorney acknowledging illegal activity involving acceptance of funds. I was asked by Mr. DiFlumera 's attorneys Kelly, Libby & Hoopes to evaluate Mr. DiFlumera with regard to whether he suffers with the diagnosis of Pathological Gambling, a diagnosis which, if present, would help explain Mr. DiFlumera 's engagement in this illegal activity.

I interviewed Mr. DiFlumera at my office on May 21, 2004 upon referral from Kelly, Libby & Hoopes.

### History of Pathological Gambling

Mr. DiFlumera began gambling as a child, playing poker for pennies. He felt his gambling did not become a problem, however, until his mid thirties. His gambling was problematic enough that he worked several jobs in order to pay off his losses and have money to gamble. He had been married at 21 years old, but his wife divorced him in the 1970's when he was 42, saying she'd "had it" with his many financial losses coupled with his lying about his gambling and his drinking and other matters. (Notably, the couple have maintained a good relationship ever since the divorce.) By the early 1980's he had substantial credit lines at a number of casinos.

Mr. DiFlumera made many attempts to stop gambling over the years. Around 1983 he asked to have all his casino credit lines cancelled, to help him abstain from gambling. Still, he went to casinos several times a year when he became anxious. Gambling would help for a while, but his anxiety would inevitably return a few months later. He went to some meetings of Gamblers Anonymous, but did not like the groups. He talked to his priest about his gambling over many years, hoping to be helped to stop. His priest advised him to pray, which he said he did, regularly. However, this had little effect on his problem. He did not seek psychological help for his compulsion to gamble, unfortunately.

By the early 1990's Mr. DiFlumera was gambling heavily again. He had debts of close to $100,000 and had to ask casinos in Las Vegas to allow him to pay off his debt over 90 days. At this point, he developed suicidal thoughts – one of two such periods in his life, each following major financial losses. At one of these times he made a suicide attempt, closing himself in his garage with his car's motor running. For a year and a half or so, his depression led him to abstain from gambling. Then Foxwoods Casino opened, creating a much easier venue than Atlantic City or Las Vegas. His gambling increased to even higher levels. If he was not winning at craps, he would change to blackjack to change

1

LANCE M. DODES, M.D.
SUITE 340D
53 LANGLEY ROAD
NEWTON CENTRE, MASSACHUSETTS 02459

his luck, and then to $25 slot machines, and so forth. He spent weekends at Foxwoods, sleeping only 5 or 6 hours over the entire weekend. He sold watches and bracelets to have more money to gamble. He called upon friends to borrow money. When he won, he invariably paid back his debts. Later, he returned to the same people to bail him out again, since his credit with them was good.

## Diagnostic Criteria

A diagnosis of Pathological Gambling (diagnostic code 312.31 of the Diagnostic and Statistical Manual – the "DSM-4" – published by the American Psychiatric Association) is determined, according to the DSM-4, by "persistent and recurrent maladaptive gambling behavior as indicated by five (or more)" of a list of 10 possible indicators. Mr. DiFlumera 's history indicates that his gambling actually meets every one of the 10 criteria, as follows.

- *Preoccupation with gambling.* Mr. DiFlumera was preoccupied with gambling for decades. Trying *not* to think about gambling was a principal method he employed to stop gambling, but he was unable to do this for long.
- *Need to gamble with increasing amounts.* Mr. DiFlumera began gambling with modest amounts, but increased over the years to enormous sums, up to $200,000 in a weekend.
- *Repeated unsuccessful efforts to control, cut down, or stop gambling.* Mr. DiFlumera tried to stop gambling many times. The longest he was able to achieve abstinence was 18 months. Each time he decided to stop, he told himself, "This is the last time I'll gamble."
- *Restlessness or irritability when attempting to cut down or stop gambling.* Mr. DiFlumera reported that when he tried to stop, he had trouble sleeping and that he became edgy and restless during the day.
- *Gambling as a way of relieving a dysphoric mood (e.g. feelings of helplessness, guilt, anxiety, depression).* As an example of this, Mr. DiFlumera reported that when his daughter was sick (she eventually died from cancer) he felt a greater need to go to a casino, thinking this would keep his mind off his daughter's terminal illness.
- *Gambling to get even after losses ("chasing" one's losses).* Chasing his losses was a regular feature of Mr. DiFlumera's gambling over decades.
- *Lying to others to conceal the extent of his involvement with gambling.* Mr. DiFlumera lied to his wife "and everyone else" about the extent of his gambling and his losses. Indeed, he regularly told people that he won, when he had lost.
- *Committing illegal acts such as theft or embezzlement to finance gambling.* Mr. DiFlumera was clear in saying that he believes he did things that he considers wrong, and that if he had not gambled so excessively and

2

LANCE M. DODES, M.D.
SUITE 340D
53 LANGLEY ROAD
NEWTON CENTRE, MASSACHUSETTS 02459

had not had the resulting financial losses, he never would have acted in a way of which he is ashamed.
- *Jeopardizing or losing a significant relationship or career opportunity because of gambling.* Mr. DiFlumera 's gambling contributed to the loss of his marriage.
- *Relying on others to provide money to relieve a desperate financial situation caused by gambling.* Mr. DiFlumera has been bailed out financially on many occasions by his ex-wife and friends. He still owes about $20,000 to friends and relatives.

## Personal History

Mr. DiFlumera grew up in Milford, Massachusetts with both parents and a brother four years older. His brother suffered with epilepsy and died from pneumonia when Mr. DiFlumera was 9 years old. They had shared a room and slept in the same bed. Mr. DiFlumera said that his brother, possibly because he was chronically ill, had been favored by his parents – given gifts and candy that were not given to Mr. DiFlumera. He recalls a time when he was beaten by his grandmother when he tried to take one of the licorice candies given only to his brother. Mr. DiFlumera also reported that he was sexually abused as a child by an aunt and a babysitter. He was afraid to tell his parents about this. Mr. DiFlumera's father was a heavy drinker who hit Mr. DiFlumera and frightened him. It was not until after his brother's death that Mr. DiFlumera felt that he was really noticed by anyone in the family. Nonetheless, when he nearly drowned at about 11 years old, he recalls wishing that he would die.

Mr. DiFlumera drank heavily himself until he was involved in a motor vehicle accident in 1985, after which he drank in moderation. He denied use of other drugs at any time.

## Mental Status

Mr. DiFlumera was appropriately dressed, alert and attentive throughout the interview. There was no suggestion of a process thought disorder, delusions or hallucinations. He acknowledged a past history of suicidal ideation but denied those thoughts recently. His affect and his mood were calm. Intellectual function was grossly intact; he understood all questions put to him and was able to give a clear and coherent history.

## Summary

Mr. DiFlumera suffers with the DSM-4 diagnosis of Pathological Gambling, meeting every criterion for the condition. His illegal activities were associated with a need for money to finance increasing levels of compulsive

LANCE M. DODES, M.D.
SUITE 340D
53 LANGLEY ROAD
NEWTON CENTRE, MASSACHUSETTS 02459

gambling with its attendant losses. Such illegal acts are so common in Pathological Gambling that they are one of the criteria of its diagnosis.

It is also notable that Mr. DiFlumera does not have the attributes of people who are criminals because they are sociopathic. He has evident feelings of shame about his behavior, and throughout his life he has maintained close relationships with his children and even his ex-wife. Indeed, she posted bond for him recently. Such long-term caring relationships are not characteristic of sociopathy. Mr. DiFlumera's not having a diagnosis of sociopathy is consistent with his criminal activity being a result of Pathological Gambling.

**Recommendation**

As in all addictions, compulsive gambling arises from deeper factors that create the seemingly nonsensical need to repeatedly perform a behavior despite its evidently self-destructive results. Mr. DiFlumera gave a history of very significant trauma during his childhood of the sort likely to produce psychiatric problems later in life. Unfortunately, he never sought psychiatric help. It would be helpful for Mr. DiFlumera to become involved in a psychotherapy to understand the emotional factors that underlie his compulsion to gamble.

Lance M. Dodes, M.D.
Former Director, Boston Center for Problem Gambling
Board Certified in Psychiatry and in Addiction Psychiatry by the American Board of Psychiatry and Neurology
Certified in Psychoanalysis by the American Psychoanalytic Association
Assistant Clinical Professor of Psychiatry, Harvard Medical School

4

Curriculum Vitae                                Lance M. Dodes, M.D.

## Curriculum Vitae

## Lance M. Dodes, M.D.

### Education

| | | |
|---|---|---|
| 1966 | A.B. | Dartmouth College (Honors Biology Major) |
| 1970 | M.D. | Harvard Medical School |

### Postdoctoral Training

| | |
|---|---|
| 1970-1971 | Intern, Rotating (Psychiatry, Medicine, Neurology), The Hospital of the University of Pennsylvania, Philadelphia |
| 1971-1974 | Resident, Psychiatry, Massachusetts Mental Health Center, Boston (Harvard) |
| Graduated 1991 | The Boston Psychoanalytic Institute |

### Licensure and Certification

| | |
|---|---|
| 1972 | Massachusetts License Registration |
| 1977 | Board certified by the American Board of Psychiatry and Neurology |
| 1993 | Certified in Psychoanalysis by the American Psychoanalytic Association |
| 1993 | Certified Addiction Specialist (in every addiction for which certification is available) by the American Academy of Health Providers in the Addictive Disorders |
| 1994 | Certified in Added Qualifications in Addiction Psychiatry by the American Board of Psychiatry and Neurology (Recertified 2003) |

### Current Academic Appointments

| | |
|---|---|
| 1986-present | Faculty, Extension Division, The Boston Psychoanalytic Society and Institute |
| 1988-present | Faculty, Center for Addiction Studies, then Division on Addictions, Harvard Medical School |
| 1992-present | Faculty, The Boston Psychoanalytic Institute |
| 1993-present | Assistant Clinical Professor of Psychiatry, Harvard Medical School |
| 2003-present | Faculty, Massachusetts Institute for Psychoanalysis |
| 2004-present | Training and Supervising Analyst, The Boston Psychoanalytic Institute |

Curriculum Vitae                                    Lance M. Dodes, M.D.


**Teaching**

**Boston Psychoanalytic Institute**

| | |
|---|---|
| 1989-present | Sole Teacher, "Psychoanalytic Views of Alcoholism and Substance Abuse" (Extension Division) |
| 1992 | Speaker, "Addictive Behavior: Psychodynamics and Treatment" (BPSI symposium) |
| 1993 | Teacher, Advanced Training Program |
| 1994-1997 | Teacher, Obsessive-Compulsive Neurosis course, (Guest Speaker 1998-2003) |
| 1997 | Speaker, Members Seminar, Boston Psychoanalytic Society |
| 2000-2003 | Teacher, Hysterical Neurosis course |

**Local contributions**

| | |
|---|---|
| 1972-1979 | Teacher for the Physical Diagnosis course for second year students, Tufts University School of Medicine and Harvard Medical School, at the Massachusetts Rehabilitation Hospital |
| 1977-1979 | Director and originator of the course "The Psychology of Medical Illness" for first and second year students at Tufts University School of Medicine, at the Massachusetts Rehabilitation Hospital |
| 1979-present | Numerous invited teaching presentations, grand rounds and guest case conferences at: Boston College, Brockton Veterans Administration Hospital, McLean Hospital, Metropolitan State Hospital, Newton-Wellesley Hospital, Cambridge Hospital, Mount Auburn Hospital, Lindemann Mental Health Center, Bunker Hill Health Center, Massachusetts General Hospital, Westwood Lodge Hospital, Westborough State Hospital, South Shore Mental Health Center, among others. |
| 1989 | Leader, Clinical Workshop on Alcoholism, "Treating the Addictions" course (sponsored by Cambridge Hospital and the Harvard Center for Addiction Studies) |
| 1994 | Speaker, Peabody Society of the Harvard Medical School |
| 1995-2003 | Lecturer, Zinberg Fellowship Program, Division on |

2

Curriculum Vitae                                          Lance M. Dodes, M.D.


|              | Addictions, Harvard          Medical School |
|--------------|---------------------------------------------|
| 1995         | Panel member, Harvard Medical School Course on Addiction |
| 1996         | Panel member, "Addiction Medicine: A Course for Clinicians" offered by the Division on Addictions, Harvard Medical School |
| 1996-present | Lecturer, "Introduction to Psychoanalysis," Boston College |
| 1997         | Speaker, Boston College Counseling Center and Wentworth Institute          Counseling Center |
| 1997         | Speaker, Regional Conference, Massachusetts Council on Compulsive Gambling |
| 1998-1999    | Speaker, Models of Assessing and Treating Compulsive Gambling program (sponsored by the Massachusetts Council on Compulsive Gambling) |
| 1998-2002    | Lecturer, "Introduction to Psychoanalysis" course, Harvard University extension school |
| 1999         | Speaker, "Impulsivity and Compulsivity in Affective Disorders Conference," Mclean Hospital |

Department

|      | of Postgraduate And Continuing Education |
|------|------------------------------------------|
| 1999 | Lecturer and Workshop Leader, Workshop for Compulsive Gambling Counselors, Division on Addictions, Harvard Medical School |
| 1999 | Lecturer, "Psychopathology and Introduction to Clinical Psychiatry" course, Harvard Medical |

School


**Regional, National Contributions**

|             | |
|-------------|---|
| 1978        | Director and lecturer, Symposium on "Topics in the Psychology of Rehabilitation Medicine" (sponsored jointly by Massachusetts Rehabilitation Hospital and Tufts University School of Medicine) |
| 1978        | Speaker, National Convention of the Congress of Rehabilitation Medicine (New Orleans) |
| 1985, 1989, | |
| 1991        | Speaker, Discussion group on "The Substance Abusing Patient in Psychoanalysis and Psychotherapy", fall meeting of the American Psychoanalytic Association (New York City) |
| 1991        | Discussant, American Psychoanalytic Association symposium, "The Psychology of Addictive Behavior" (Seattle) |
| 1992        | Speaker, New Frontiers in Alcohol and Substance Abuse, sponsored by CME, Inc. and *The* |

*Psychiatric*

3

Curriculum Vitae                                        Lance M. Dodes, M.D.

|  |  |
|---|---|
|  | *Times* (Chicago) |
| 1993 | Speaker and Moderator, Symposium on Compulsive Gambling (sponsored by the Massachusetts Council on Compulsive Gambling and the Center for |
| Problem | |
|  | Gambling, Boston) |
| 1996 | Discussant, Alcoholism Committee, Massachusetts Psychiatric Society |
| 1997 | Sole guest, Mass. Department of Mental Health television program on compulsive gambling |
| 1999, 2003 | Lecturer, Speaker Program of the William Alanson White Psychoanalytic Institute (New York City) |
| 2000 | Guest Lecturer, Milwaukee Psychoanalytic Institute (Milwaukee, WI) |
| 2001 | Lecturer, American Psychological Association, Division 39, Connecticut chapter (New Haven) |
| 2002 | Speaker, Annual Psychoanalytic Conference, Canadian Psychoanalytic Society (Quebec English branch), Montreal |
| 2002 | Speaker, New Orleans Psychoanalytic Society |
| 2003 | Discussant, Annual meeting, American Association of Addiction Psychiatry (Las Vegas) |
| 2003 | Teacher, Mini-course on Psychoanalytic Understanding of Addiction, Massachusetts Institute for Psychoanalysis |

**Advisory and supervisory responsibilities**

|  |  |
|---|---|
| 1978-1979 | Supervisor, Psychiatry Residency Program, Tufts University School of Medicine |
| 1979-1985 | Supervisor, Psychiatry Residency Program, McLean Hospital |
| 1986-1989 | Teacher, Internship and Residency Program, Cambridge Hospital |
| 1989-2001 | Supervisor, Psychiatric Outpatient Department, Mount Auburn Hospital |
| 2001-2003 | Supervisor, Psychiatry Residency Program, St. Elizabeth's Hospital (Boston) |
| 2003-present | Supervisor, Beth Israel Deaconess Medical Center |

**Major Administrative Responsibilities**

|  |  |
|---|---|
| 1974-1979 | Director of Psychiatry, Massachusetts Rehabilitation Hospital (now Spaulding Rehabilitation Hospital) |

4

Curriculum Vitae                                          Lance M. Dodes, M.D.

| | |
|---|---|
| 1974-1991 Commission, | Psychiatric Consultant, Massachusetts Rehabilitation |
| | Disability Determination Service |
| 1979-1985 | Director, Appleton Treatment Center, McLean Hospital (The addiction treatment center) |
| 1986-1989 | Psychiatric Consultant, Alcoholism Program, Cambridge-Somerville Mental Health Center and Cambridge Hospital |
| 1987- 1992 | Psychiatric Educational Consultant, South Shore Council on Alcoholism (Quincy, MA) |
| 1992 | Acting Director, Outpatient Psychiatry, Mount Auburn Hospital |
| 1995- present | Psychiatric Consultant, Federal Aviation Administration |
| 1989- 2003 | Director, The Boston Center for Problem Gambling (at Mount Auburn Hospital and at Brighton-Allston Mental Health Center) |


## Current Major Committee Positions

| | |
|---|---|
| 1986-present | Chairman, Discussion group on "The Substance Abusing Patient in Psychoanalysis and Psychotherapy."  The American Psychoanalytic Association. |
| 1998-2004 | Co-Chairman, Members Seminar, The Boston Psychoanalytic Society |


## Current Professional Societies

| | |
|---|---|
| 1982-present | American Psychoanalytic Association (Affiliate Member 1982-1993, Active Member 1993-) |
| 1986-present | American Academy of Psychiatrists in Alcoholism and Addictions (Founding Member) |
| 1991-present | Boston Psychoanalytic Society (Member) |


## Editorial Work

| | |
|---|---|
| 1992, 2000 | Reviewer, *New England Journal of Medicine* |
| 1993-present | Reviewer, *General Hospital Psychiatry* |
| 1993-present | Reviewer, *American Journal on Addiction* |
| | Reviewer, *Bulletin of the Menninger Clinic* |
| 1997-present | Editorial Board, *Journal of Gambling Studies* |
| 2000-present | Reviewer, *American Journal of Drug and Alcohol Abuse* |


## Awards and Honors

Curriculum Vitae                                     Lance M. Dodes, M.D.

**Academic**
1966     Graduated from Dartmouth College with honors and "With Distinction" in
         the Honors Biology Major
1968     Dean's Medal (First in Class), Dartmouth Medical School

**Professional**
1994-5   Member, Blue Ribbon Committee on Compulsive Gambling,
Massachusetts
         Medical Society (Participated in drafting the
         statement adopted by the American Medical Association)
1998     Invited contributor, *The Freud Encyclopedia*
1998     Selected National Advisor to the American Psychoanalytic
         Foundation for the development of their Internet site on
         Psychoanalysis and Alcoholism
2001     Selected by the Division on Addictions at Harvard Medical
         School for "Distinguished Contribution" to the study and
         treatment of addictive behavior
2003     Invited Editor, *Canadian Journal of Psychoanalysis*

**Bibliography**

**Original Articles**

1.  Ballard WW, Dodes LM.  The Morphogenetic Movements at the Lower Surface
    of the Blastodisc in Salmonid Embryos. *Journal Experimental Zoology* 1968;
    168:67-83.
2.  Kreek MJ, Dodes LM, Kane S, Knobler J, Martin R.  Long Term Methadone
    Maintenance Therapy: Effects on Liver Function.  *Annals Internal Medicine* 1972;
    77:598-602.
3.  Shader RI, Jackson AH, Dodes LM.  The Anti-Aggressive Effects of Lithium in
    Man.  *Psychopharmacologia.*1974; 40:17-24.
4.  Dodes LM.  Abstinence from Alcohol in Long-Term Individual Psychotherapy
    with Alcoholics. *American Journal Psychotherapy*1984; 38: 248-256.
5.  Siexas F, Dodes LM.  The Addiction Severity Index: A Clinical Note. *McLean
    Hospital Journal* 1987; 12:31-38.
6.  Dodes LM  The Psychology of Combining Dynamic Psychotherapy and
    Alcoholics Anonymous. *Bulletin of the Menninger Clinic* 1988; 52:283-293.
7.  Dodes LM.  Addiction, Helplessness, and Narcissistic Rage. *Psychoanalytic
    Quarterly* 1990; 59:398-419.
8.  Dodes LM.  Psychotherapy is Useful, Often Essential, for Alcoholics.  *The
    Psychodynamic Letter* 1991; 1 (no. 2):4-7 (Invited paper).
9.  Dodes LM. Compulsion and Addiction. *Journal of the American Psychoanalytic
    Association* 1996; 44:815-835.
10. Dodes, LM. Addiction and Psychoanalysis. *Canadian Journal of Psychoanalysis*
    2003; 11:123-134.

Curriculum Vitae                                        Lance M. Dodes, M.D.

**Book Review**

Dodes LM. Review of *Substance Abuse as Symptom, A Psychoanalytic Critique of Treatment Approaches and the Cultural Beliefs that Sustain Them* by Louis S. Berger. In: New England Journal of Medicine 1992; 326:1368-1369.

**Book Chapters**

1. Dodes LM, Khantzian EJ.  Individual Psychodynamic Psychotherapy. In: Frances R,  Miller S, editors. *Clinical Textbook of Addictive Disorders.* New York: Guilford; 1991. p. 391-405.
2. Dodes LM, Khantzian EJ.  Psychotherapy and Chemical Dependence. In: Ciraulo D,  Shader R. editors. *Clinical Manual of Chemical Dependence.* Washington: American Psychiatric Press; 1991. p. 345-358.
3. Brehm N, Khantzian EJ, Dodes LM. Psychodynamic Approaches to Substance Abuse: An Update. In: Galanter M., editor. *Recent Developments in Alcoholism,* Volume 11. New York: Plenum; 1993.
4. Dodes LM, Khantzian EJ.  Individual Psychodynamic Psychotherapy. In: Frances R,  Miller S., editors. *Clinical Textbook of Addictive Disorders, Second Edition.* New York: Guilford; (in press, due 1998). p. 479-495.
5. Dodes LM Obsession and Compulsion. In: Erwin E, editor. *The Freud Encyclopedia.*  New York: Routledge (2002).

**Monographs**

1. Dodes LM.  Psychic Helplessness and the Psychology of Addiction. In: Dowling S, editor. *The Psychology and Treatment of Addictive Behavior.* Madison, CT: International Universities Press; 1995. P 133-162. (Workshop Series of the American Psychoanalytic Association, vol. 8),

**Books**

1. Dodes, LM. *The Heart of Addiction*; New York: HarperCollins (2002).